**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **V.** | : | **CR. NO. 07-86-01S** |
| | : | |
| **ARMAN TER-ESAYAN** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

## I. PERSONAL CHARACTERISTICS OF THE DEFENDANT.

The defendant, Arman Ter-Esayan, admits that he has engaged in serious criminal behavior that has harmed many individuals and financial institutions as well as the Stop & Shop stores and that he deserves substantial punishment. In determining the appropriate punishment, we ask the Court to consider that Mr. Ter-Esayan acknowledged his guilt early, waived preliminary hearing and indictment, and pled guilty to an information. Mr. Ter-Esayan never denied that he played a role in the theft and accepted early on that his actions were illegal and that he has hurt a number of people. He accepted responsibility knowing that he would receive a substantial prison sentence which might result in deportation after his sentence is completed. In addition, he accepted the plea with the full understanding of the implications of having felony convictions for the rest of his life.

Mr. Ter-Esayan is a man of only 22 years who first moved to the United States just four years ago from Armenia. He moved to the United States to join his parents who had come here for political asylum. Mr. Ter-Esayan's father had been a leader in the Armenian military and left

the country during a period of political upheaval. Armen stayed behind to finish his schooling and then came to the United States.

Upon arriving in the United States, Mr. Ter-Esayan began taking classes part time and working a number of part-time jobs. He aspired to become a businessman and wanted to own his own business. At the time of his arrest, he was completing negotiations with a national coffee and dessert chain (Kelly's Fudge and Coffee) to purchase a franchise for the Glendale area and operate his own business.

Mr. Ter-Esayan was extremely happy to rejoin his family in the United States. By the time he arrived in California, virtually all of his relatives had immigrated to the United States. He has a large group of aunts, uncles and cousins who live in California and provide a strong support network. The family is very close-knit and although they are deeply disappointed with his illegal activities, they remain supportive of him.

In addition, upon arriving in the United States, Mr. Ter-Esayan met and began dating Ms. Araz Setaghaian, a young woman from Glendale. They fell in love and eventually Mr. Ter-Esayan proposed. The wedding was set for November 8, 2007 in Glendale. Mr. Ter-Esayan's arrest obviously changed those plans, but the couple persisted. In July of this year, thanks to the cooperation of the A.C.I. Intake Service Center, Mr. Ter-Esayan and Ms. Setaghaian were married. While Ms. Setaghaian admits to being stunned by the offenses committed by Mr. Ter-Esayan, she remains extremely supportive and is determined to help him get his life back on track, both while he is incarcerated and after his release.

Although Mr. Ter-Esayan admits that his judgment in this case was poor and that the choice he made to engage in this behavior is inexcusable, he would ask the Court to look at the fact that he has no prior criminal record as an example that these events were an aberration in his

character. Mr. Ter-Esayan had never purposefully harmed anyone. After living in the United States for awhile, he began to meet new friends, mostly in the Armenian community, and began to fall into a party lifestyle. He admits that he began to do some recreational drug use with friends which increased before his incarceration.

Mr. Ter-Esayan also admits that he when he met Mr. Stepanian he was persuaded that this plan was an opportunity to earn some quick money. Mr. Ter-Esayan was raised to know right from wrong but saw an opportunity to get some money to help him open his business and start his new life with his wife with some financial stability. As Mr. Ter-Esayan told probation, he realizes that this was an incredibly poor decision that will have an impact on the rest of his life. In the last year of his life, before being arrested, Mr. Ter-esyan began to break away from the values and the morals that his family instilled in him. He hid things from his parents and from his fiancée. We ask the Court to realize that this was not the same young man who for the previous twenty years had stayed out of trouble and whose hard work and ambitions had made his family so proud of him. He is truly remorseful and promises this Court that if given the opportunity, he will pay his debt to society and lead a productive life with no further illegal activities.

## II. **MR. TER-ESAYAN IS SUBJECT TO A TWO-LEVEL ENANCEMENT FOR THE NUMBER OF VICTIMS.**

The PSR at ¶ 20 concludes that six levels should be added under §2B1.1(b)(2)(C) because the offense involved more than 250 victims. There were 238 individuals whose accounts were accessed, 26 financial institutions at which these accounts were held, and Stop and Shop in whose stores the account information was stolen.

Under the Guidelines, however, not all of these persons and entities are to be counted in determining the number of victims for purposes of the enhancement under §2B1.1(b)(2)(C). Application Note 1 to §2B1.1 defines "victim" as follows:

> "Victim" means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense. "Person" includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies.

"Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense"; and "pecuniary harm" means "harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm." §21.1, Application Note 3.

Thus "victims" for purposes of the enhancement are limited to those persons who sustained actual pecuniary loss and individuals who suffered bodily injury.

The individuals whose account numbers were stolen have all been made financially whole by the banks. PSR ¶¶ 11-12. Thus there are 26 victims — the banks — who *sustained* actual pecuniary harm, and therefore, under §2B1.1(b)(2)(A), only 2 levels should be added for number of victims rather than 6 as asserted by the PSR.[1]

---

[1]The Probation Officer in the Addendum to the PSR takes the view that the individual account holders should be counted because they suffered a temporary financial loss. We do not believe the language of the Guideline definitions supports this view. The intention of the Guidelines appears to be that the only victims to be counted are those who *sustain actual* monetary losses. These words are not descriptive of someone whose account suffers a deduction of funds which, under the rules of the bank, are immediately subject to being restored because the deduction was not authorized by the account holder. Such a person has not sustained an actual loss.

In saying this and making this argument we do not mean to diminish the true harm to the account holders. We simply ask that the Court apply the Guidelines and the enhancements according to the terms and definitions set forth in the Guidelines.

## III. THE ENHANCEMENT OF 'SOPHISTICATED MEANS' DOES NOT APPLY TO MR. TER-ESAYAN.

The PSR recommends a 2-level enhancement for sophisticated means under §2B1.1(b)(9)(C). PSR ¶21. This enhancement is not appropriate as to Mr. Ter-Esayan. Mr. Ter-Esayan did not know what equipment was needed to commit the offense conduct, and did not and does not know how to use the equipment. He was recruited by the co-defendants because he had credit available, and his role was to help pay for the travel and lodging expenses of the defendants and for some of the equipment that was used. Otherwise he provided only menial assistance as one of the co-defendants removed and installed the pin pad terminals in the stores. As reflected in the description of the offense behavior in the PSR at ¶ 10, as well as in the discovery, the videos in the stores show that in each instance a co-defendant Shatarevyan removed and installed the pin pad terminals. The investigators determined that the laptop on which credit and debit card numbers and pin numbers were found was used by the co-defendant Stepanian, and the various other pieces of equipment used in committing the offenses as well as the laptop were found in Stepanian's room. PSR ¶10, p. 4.

The recommendation for a sophisticated means enhancement rests on the use of "sophisticated technology." See PSR ¶10, p.6, and ¶21. Mr. Ter-Esayan did not know how to acquire or use this technology. This does not excuse his participation in the offenses, but it is significant in assessing the level of his culpability. It would not be appropriate to add an enhancement for sophisticated means to his offense level.

## IV. AN UPWARD DEPARTURE FOR RISK OF SUBSTANTIAL ADDITIONAL LOSS IS NOT WARRANTED.

The PSR suggests, pursuant to Application Note 19(A) of §2B1.1, that the Court consider whether an upward departure is warranted because the offense created a risk of substantial additional loss beyond that determined for purposes of the guideline level under subsection (b)(1). PSR ¶70. The PSR points to the fact that "thousands" of credit and debit card numbers and pin numbers were found on co-defendant Stepanian's computer. However, we are aware of no evidence or analysis showing the origin of these additional credit and debit card numbers and pin numbers, and whether they came from the offense in which Mr. Ter-Esayan was involved or from other activities of Mr. Stepanian. Nor is there any evidence showing that these numbers in Mr. Stepanian's computer are accurate numbers of accounts and pin numbers which could have been used to access funds. Even assuming the numbers are accurate — i.e., that the account numbers and pins were accurately scanned and stored in the computer — and assuming they came from the offense in which Mr. Ter-Esayan participated, without additional information it remains speculative how much additional funds might have been obtained from these accounts. An upward departure for risk of substantial additional loss is not warranted.

## V. SENTENCE RECOMMENDATION.

For all these reasons, we respectfully request that the Court sentence Mr. Ter-Esayan to 48 months imprisonment, a two-year period of supervised release, restitution and a $200 special assessment. Our request for 48 months of imprisonment is based upon a total offense level of 20, an adjustment to level 17 for acceptance of responsibility, a criminal history category of I, a

resulting guideline range of 24-30 months, and the imposition of 24 months. The aggravated identify theft violation requires the imposition of a consecutive 24-month sentence.

For the foregoing reasons, the defendant, Arman Ter-Esayan, respectfully requests that this Honorable Court impose the above-recommended sentence.

Respectfully submitted,
Arman Ter-Esayan
By his attorneys,

/s/ George W. Buehler

George W. Buehler, Esq.
644 South Figueroa
Los Angeles, CA 90017
(213) 625-3900
(213) 624-1600 (FAX)

/s/ John E. MacDonald

John E. MacDonald, Esq.
Larochelle & MacDonald, Inc.
One Turks Head Place, Suite 1440
Providence, Rhode Island 02903
(401) 421-1440
(401) 421-1442 (FAX)

**CERTIFICATION**

I hereby certify that on August 31, 2007 a true copy of this document was delivered electronically using the CM/ECF system which will send notification to A.U.S.A. Lee Vilker and by regular mail, postage prepaid to A.U.S.A. Lee Viker at 50 Kennedy Plaza, Providence, Rhode Island 02903.

/s/ John E. MacDonald

John E. MacDonald, Esq.
Larochelle & MacDonald, Inc.
One Turks Head Place, Suite 1440
Providence, Rhode Island 02903
(401) 421-1440
(401) 421-1442 (FAX)