IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CR No. 07-086-01S |
| | : | |
| ARMAN TER-ESAYAN | : | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS
TO PRE-SENTENCE REPORT

Comes now the United States of America, by and through its attorneys, Robert Clark Corrente, United States Attorney, and Lee H. Vilker, Assistant United States Attorney, and hereby objects to the Defendant's Objections to the Pre-Sentence Report for the reasons set forth in the accompanying Memorandum.

Respectfully submitted,

UNITED STATES OF AMERICA
By its attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/Lee H. Vilker
LEE H. VILKER
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401)709-5000
(401)709-5001(fax)
lee.vilker@usdoj.gov

Dated: September 4, 2007

**CERTIFICATE OF SERVICE**

I, hereby certify that on this 4th day of September, 2007, I caused the within Government's Response to be electronically filed with the United States District Court for the District of Rhode Island, using the CM/ECF System. The following participant has received notice electronically:

John E. MacDonald, Esquire
Larochelle & MacDonald, Inc.
One Turks Head Place, Suite 1440
Providence, R.I. 02903

I further certify that a copy was mailed via regular mail to:

Kristin Mattias
United States Probation Officer
John O. Pastore Federal Building
Two Exchange Terrace
Providence, RI 02903

/s/Lee H. Vilker
Lee H. Vilker
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401)709-5000
(401)709-5001(fax)
Lee.vilker@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CR No. 07-86-01S |
| | : | |
| ARMAN TER-ESAYAN | : | |

GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE REPORT

Defendant Arman Ter-Esayan ("Ter-Esayan") has objected to three different sentencing enhancements the Probation Department found to apply to this case. Specifically, Ter-Esayan argues that the Probation Department erred: (1) when it added six levels under U.S.S.G. § 2B1.1(b)(2) because the offense involved more than 250 victims, (2) when it added two levels because the offense involved "sophisticated means" under U.S.S.G. § 2B1.1(B)(9)©, and (3) when it added two levels because the offense involved the trafficking and use of stolen credit and debit cards under U.S.S.G. § 2B1.1(B)(10)(B)(I)[1]. For the reasons described below, the United States opposes defendant's objections to the Pre-Sentence Report and submits that the Probation Department correctly calculated the Guideline range applicable to this case.

[1] In defendant's Sentencing Memorandum, defendant does not raise his earlier noted objection to the 2-level enhancement for trafficking in stolen access devices under USSG § 2B1.1(B)(10)(B)(I). As it is unclear whether defendant still wishes to press this objection, the United States will put forth in this Memorandum its position as to the applicability of this enhancement.

A. Brief Overview of Offense Conduct

As the facts of this case are well-known to the Court and are spelled out in great detail in the Prosecution Version (PSR ¶ 10), the Government will only briefly summarize them herein. It is clear from the undisputed facts that Ter-Esayan and his three co-conspirators engaged in a deliberate, well-planned scheme to obtain access devices and personal identification numbers of Rhode Island residents and to transfer this personal information to third parties so that they may make unauthorized and fraudulent withdrawals and charges. Defendants perpetrated this scheme by targeting pin pad terminals in various Stop & Shop supermarket stores throughout Rhode Island. Working in unison and with great efficiency, defendants entered Stop & Shop stores late at night, distracted a cashier, and, within as little as 12 seconds, replaced legitimate pin pad terminals with ones that contained "skimming" equipment. This skimming equipment enabled the defendants to recover the credit and debit card numbers, with corresponding personal identification numbers, of the unfortunate individuals who happened to shop at the particular store during the period in which the skimming equipment was in place.

It is clear from the offense facts that neither Ter-Esayan nor any of his co-conspirators had any connection whatsoever to Rhode Island. The defendants simply viewed Rhode Island as a location they could quickly victimize before they returned to California and transferred Rhode Islanders' account information to others involved in this conspiracy. It is also clear from the offense facts that the conspiracy required a great deal of forethought and that sophisticated equipment was necessary to perpetuate this crime. The skimming equipment the defendants placed in the pin-pad terminals not only simultaneously recorded card numbers and corresponding pin numbers, but the wiring in the circuitry was spliced so that the transactions

would continue to be processed by Stop & Shop without raising suspicion. (PSR ¶ 10). In addition, found within the hotel room of co-defendant Stepanian was a virtual smorgesborg of equipment used to steal access device information, including a laptop containing thousands of credit and debit card numbers, credit card readers, electrical wires, a soddering iron, circuit boards and software designed to download access device information from skimming equipment. (Id.)

Finally, it is also clear that a large number of individuals and institutions suffered as a result of this offense. As the PSR makes clear, 238 individuals had their account numbers stolen by the defendants and then used by others. (PSR ¶ 12). Many of these victims responded to the Probation Office and relayed how defendants' conduct caused inconvenience, stress, hardship and some expense. (Id.) What underscores each individual victim's statement is the harm they endured as a result of having their privacy invaded by defendants' theft of their identities. In addition, the financial loss was ultimately borne by 26 different financial institutions that reimbursed their account holders more than $132,000 in losses.

B. Ter-Esayan's Role in the Offense

Ter-Esayan played a critical role in the execution of this scheme. First and foremost, he is captured on videotape on numerous occasions assisting co-defendant Shatarevyan in removing pid-pad terminals from various Stop & Shop stores in Rhode Island. (PSR ¶10) Defendants Ter-Esayan and Shatarevyan had to work efficiently and in unison when removing existing terminals and replacing them with ones containing skimming equipment. They had to complete this task in a matter of seconds before the cashier - distracted by co-defendant Baltadjian - returned to the checkout aisle.

Second, Ter-Esayan played a significant role in the planning and financing of the conspiracy. On both trips the defendants made to Rhode Island, one of the hotel rooms was taken in Ter-Esayan's name. (The other room was taken in the name of co-defendant Stepanian.) Moreover, the vehicle the defendants rented in Connecticut was rented in the name of defendant Ter-Esayan. Finally, a review of Ter-Esayan's own personal credit cards reveals that he paid for the cost of the hotel in Connecticut and that, in September 2006, he made a $5,434 purchase of a device designed to capture credit card numbers and a software program whose function is to download captured credit card numbers. (PSR ¶ 10.) There can be little doubt that defendant Ter-Esayan played a significant role in this conspiracy.

C. <u>Argument</u>

1. <u>Objections to Pre-Sentence Report</u>

Defendant Ter-Esayan makes three objections to the Pre-Sentence Report. Specifically, Ter-Esayan objects to the enhancement of his sentence by 6-levels under U.S.S.G. § 2B1.1(b)(2) based on the number of victims, the addition of 2-levels because the offense involved "sophisticated means" under U.S.S.G. § 2B1.1(B)(9)©, and the enhancement of two levels because the offense involved the trafficking and use of stolen credit and debit cards under U.S.S.G. § 2B1.1(B)(10)(B)(I). The United States will address each of these objections independently.

a. *Number of Victims*

There are two categories of victims in this case: 238 individuals whose debit and credit accounts were depleted and whose identities were stolen and 26 financial institutions that ultimately bore the financial loss. As there were more than 250 victims, the Probation Department rightly concluded that the Offense Level should be increased by six levels pursuant to U.S.S.G. § 2B1.1(b)(2)©. Defendant Ter-Esayan objects, claiming that the individuals whose accounts were compromised are not "victims" under the Guidelines because their economic loss was temporary. Defendant is wrong.

Application Note 1 to Guideline section 2B1.1 defines victim as: "(A) any person who sustained any part of the actual loss determined under subsection (b)(1) or (B) any individual who sustained bodily injury as a result of the offense." The Application Note defines "person" to include individuals, corporations and companies.

It is clear that the individual debit and credit card holders are "victims" of this case. Although the individuals are all believed to have been reimbursed by their banks, they suffered a very real economic loss, in addition to the inconvenience, stress and feeling of vulnerability they endured. The individuals suffered temporary economic losses that resulted from the depletion of their bank accounts. As several of the victims' letters to Probation indicate, the depletion of funds from their bank accounts, even if temporary, caused substantial hardship to a number of victims. Some individuals relayed how they were on vacation when this fraud occurred and had difficulty paying for expenses; others reported how they had difficulty paying their bills. (See Attachment to PSR.) The fact that the financial institutions, sometimes weeks or months later, reimbursed the individual account holders does not alter the fact that each individual suffered a

very real economic loss. See United States v. Lee, 427 F.3d 881 (11th Cir. 2005) (fact that some victims were able to offset losses through collateral and repossession does not mean they are not "victims" under the fraud Guidelines"), cert. denied, 2006 U.S. LEXIS 1943 (2006).[2]

As the Court of Appeals in Lee made clear, the Guidelines themselves appear to contemplate that individuals are still considered "victims" even if their losses are later offset. Id. at 895. In holding that individuals who manage to recover their losses remain "victims" under the Guidelines, the Court of Appeals pointed to Application Note 2(e) (now Application Note 3(e)), which concerns credits against losses. That provision allows for a credit to be given the defendant in calculating the amount of loss under section 2B1.1 for amounts returned to the victim before the offense is detected. The Court of Appeals in Lee recognized that "inherent in the credit against loss provision is an acknowledgment that there was in fact an initial loss, even though it was subsequently remedied by recovery of collateral or return of goods." Id. [3]

---

[2] The only decision the United States could locate that held to the contrary is United States v. Yagar, 404 F.3d 967 (6th Cir. 2005). In Yagar, the Sixth Circuit held that individuals victimized in a bank fraud scheme who were quickly reimbursed by their banks were not "victims" under the Guidelines. The Yagar decision was sharply criticized by the Court of Appeals in Lee for having failed to properly interpret the Guidelines. In any event, the Yagar court did state that "there may be situations in which a person could be considered a 'victim' under the Guidelines even though he or she is ultimately reimbursed . . ." Id. at 971.

[3] The Eleventh Circuit, in two recent unpublished opinions, held that individual victims of fraud schemes remain "victims" under the Guidelines even if their losses are ultimately reimbursed. See United States v. Smiley, 210 Fed. Appx. 972 (11th Cir. 2006) (reimbursement does not preclude a person defrauded in investment fraud scheme from being considered a "victim"); and United States v. Longo, 184 Fed. Appx. 910 (11th Cir. 2006) (reimbursement does not preclude a person from being considered a "victim").

As the individual account holders in this case sustained real, though temporary, economic losses as a result of having their bank accounts depleted, they are rightfully considered "victims" of this offense.

b. *Sophisticated Means*

Defendant Ter-Esayan next claims that the Probation Department erred when it applied a 2-level enhancement because the offense involved "sophisticated means." The United States disagrees.

Section 2B1.1(b)(9)© of the Guidelines calls for a 2-level enhancement if "the offense otherwise involved sophisticated means." Application Note 8(b) clarifies the types of criminal conduct that would involve sophisticated means:

> For purposes of subsection (b)(9)©, 'sophisticated means' especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

The offense conduct in this case involved sophisticated means in two distinct manners. First, the removal and reinstallation of the pin-pad terminals required an extreme degree of coordination and sophistication in order to be successful. Each of the defendants was required to perform his task in unison and with great efficiency so as to switch terminals without being detected. While one of the defendants (Stepanian) served as a lookout outside the store, another (Baltadjian) approached a cashier and caused him/her to leave the register. At that moment, defendant Shatarevyan would quickly remove a pin pad terminal, hand it to defendant Ter-Esayan, and quickly install a new terminal that contained skimming equipment. This whole

process was completed in as little as twelve seconds. This high degree of collaboration and coordination was unusually sophisticated and warrants the sophisticated means enhancement.

Second, the offense involved the use of highly sophisticated technology. Each of the pin pad terminals the defendants installed contained skimming equipment that not only recorded the debit and credit card numbers but also recorded personal identification numbers that customers entered into the terminals. What made this scheme successful (at least until the defendants' arrest on February 26), was the sophisticated manner in which the wiring inside the tampered terminals was spliced so that the data was sent simultaneously to the skimming equipment and to the merchant service provider being used by Stop & Shop. This splicing allowed for the transactions to continue to be processed by the stores without raising suspicion. In addition, the technology found within co-defendant Stepanian's hotel room revealed a high level of sophistication. Not only did agents find skimming equipment and related paraphernalia in Stepanian's hotel room, they found a laptop which contained software designed to download credit and debit card numbers onto blank cards with magnetic strips. That withdrawals were ultimately made on the debit card numbers the defendants acquired demonstrates that the defendants were successful in utilizing this sophisticated technology to imprint access device information they obtained from the tampered terminals onto blank cards with magnetic strips. This type of sophistication falls well within the definition of "sophisticated means" provided for by the Guidelines, which describes conduct as relatively pedestrian as having a main office in one jurisdiction and a solicitation office in another as sufficient to warrant the enhancement.

Indeed, courts around the country have applied the "sophisticated means" enhancement in cases involving less sophistication than that employed by the defendants in this case. See, e.g., United States v. Wright, 2007 U.S. App. LEXIS 18988 (5th Cir. 2007) ("We find no error in the finding that [defendant] used sophisticated means. Depositing a check from someone else into your account, and then using that money to purchase a cashier's check in someone else's name, are means as sophisticated as those in [other case]. . . ."); United States v. Bistrup, 449 F.3d 873, 882-83 (8th Cir. 2006) (affirming application of "sophisticated means" enhancement, holding that "while some of [defendant's] individual acts may not have been particularly sophisticated, there were complexities in his overall scheme," including lying to the victims, making partial payments to earlier victims and using different accounts to conceal the fraud); and United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003) (affirming application of "sophisticated means" enhancement in credit card fraud scheme where defendant purchased personal identification from the Internet, used that information to change the billing address and credit limits on the victims' credit or debit cards, and then ordered merchandise with pre-paid phone cards on the victims' credit cards to be delivered to the changed address.).

In arguing against the applicability of this enhancement, defendant contends that he provided only "menial" assistance and that he did not know how to acquire or use the technology. (Defendant's Sentencing Memorandum at 5.) This argument is erroneous as a matter of fact and specious as a matter of law. Defendant paid for lodging and travel expenses on his personal credit card, and made a $5,434 purchase of a device designed to capture credit card numbers and a software program whose function is to download captured credit card numbers. (PSR ¶ 10.) Defendant played a critical role in the offense and was well aware that it required

the use of sophisticated technology, as he himself purchased some of this technology. On a broader level, defendant was convicted of *conspiracy* to traffic in access devices. The legal question is whether the offense itself involved sophisticated means, not whether defendant was aware of how the technology operated. In this case, there can be no question that the highly sophisticated technology employed by the defendants, combined with the high degree of coordination this conspiracy entailed, warrant application of the sophisticated means enhancement.

c. *Trafficking in Access Devices*

In correspondence with the Probation Department, defendant Ter-Esayan noted his objection to the inclusion of a 2-level enhancement under Guideline section 2B1.1(b)(10)B(B)(I) because the offense involved "trafficking" in unauthorized access devices. The term "traffic" is defined in 18 U.S.C. § 1029(e)(5) as to "transfer, or otherwise dispose of, to another, or to obtain control of with intent to transfer or dispose of."

In his objection, Ter-Esayan argued that because the United States does not have evidence that Ter-Esayan himself transferred access devices to others, the trafficking enhancement should not apply. Defendant misconstrues the crime for which he was convicted. Defendant was convicted of *conspiring* to traffic in unauthorized access devices. And there can be no doubt that the access devices the defendants stole from Rhode Islanders were transferred to others in furtherance of the conspiracy.

As the Pre-Sentence Report makes clear, law enforcement has recovered ATM surveillance videotapes from California which capture individuals *other* than the defendants making ATM withdrawals from the accounts of the individuals whose cards were compromised

in the Cranston and Coventry Stop & Shop stores. (PSR ¶ 10.) As individuals other than the defendants made these withdrawals, it is apparent that the defendants, in furtherance of the conspiracy, transferred the credit and debit card numbers (along with individually assigned personal identification numbers) to other individuals in California. Indeed, if they had not transferred this access device information, the withdrawals would not have been possible. It is immaterial whether Ter-Esayan himself transferred these access devices or whether they were transferred by one or more of his co-conspirators. As an admitted member of the conspiracy, Ter-Esayan is responsible for its foreseeable consequences.

And there can be no question that it was foreseeable to the defendant that the stolen access devices would be transferred to others. Found within the hotel room of co-defendant Stepanian was a laptop which contained thousands of credit and debit card numbers and an assortment of equipment designed to steal access device information. In addition, defendant Ter-Esayan himself purchased on his own credit card a $5,000 device designed to capture credit card numbers and a software program whose function is to download captured credit card numbers. (PSR ¶ 10.) Meanwhile, co-defendant Stepanian purchased on his credit card magnetic card readers, skimming devices, computer software designed to download card numbers and white plastic cards with magnetic stripes designed to be imprinted with access device information. (Id.) There can thus be no question that the entire aim of the conspiracy was to acquire unauthorized access devices and to traffic in those devices.

The First Circuit recently had an opportunity to examine this trafficking enhancement in United States v. Alli, 444 F.3d 34 (1st Cir. 2006). The defendant in Alli was a United States postal worker who stole letters containing credit cards and who intend to sell those cards to a

third party. The Court of Appeals affirmed the district court's (Torres, J.), application of the 2-level enhancement for trafficking in unauthorized access devices under USSG § 2B1.1(b)(10)B(B)(I). In affirming the application of this enhancement, the Court of Appeals rejected defendant's argument that the enhancement should apply only upon a conviction for trafficking in access devices and only if the defendant himself stood to gain more than $1,000, an element of 18 U.S.C. § 1029(a)(2). Id. at 39. Noting that the defendant obtained control of the stolen credit cards and attempted to sell them to others, the Court of Appeals concluded that the "generally accepted definition of trafficking and the statutory definition are clearly satisfied here." Id. The defendants in this case did not merely attempt to transfer the access devices to others (as did the defendant in Alli), they successfully trafficked in stolen credit and debit cards. The enhancement for trafficking in unauthorized access devices should apply.

Respectfully submitted,

UNITED STATES OF AMERICA
By its attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/Lee H. Vilker

LEE H. VILKER
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401)709-5000
(401)709-5001(fax)
lee.vilker@usdoj.gov

Dated: September 4, 2007

**CERTIFICATE OF SERVICE**

I, hereby certify that on this 4th day of September, 2007, I caused the within Government's Memorandum of Law to be electronically filed with the United States District Court for the District of Rhode Island, using the CM/ECF System. The following participant has received notice electronically:

John E. MacDonald, Esquire
Larochelle & MacDonald, Inc.
One Turks Head Place, Suite 1440
Providence, R.I. 02903

I further certify that a copy was mailed via regular mail to:

Kristin Mattias
United States Probation Officer
John O. Pastore Federal Building
Two Exchange Terrace
Providence, RI 02903

/s/Lee H. Vilker
Lee H. Vilker
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401)709-5000
(401)709-5001(fax)
Lee.vilker@usdoj.gov